A04A0017. BRUCE v. THE STATE.

(603 SE2d 33)

PHIPPS, Judge.

After a jury trial, Kenneth Lee Bruce was convicted of child molestation for touching the vagina of K. M., who was nine years old at the time of the incident. On appeal, Bruce contends that he was deprived of effective assistance of counsel. Because Bruce has shown no reversible error, we affirm.

The state presented the testimony of K. M., 11 years old at the time of trial, who recounted a weekend she had spent with Bruce. On Friday night, the two ate pizza and watched television, after which K. M. went upstairs to sleep in Bruce's roommate's bedroom. The roommate, Ted Lee, was spending that weekend with K. M.'s mother and her fiancé, Tom Manor. K. M. testified that after she went to bed, "[Bruce] touched me in my tutu . . . [b]etween my legs." She stated, "[h]e started doing it and he stopped and I started waking up." She remembered crying and asking to call her mother, but Bruce asked whether she could wait until morning. No call was made. Instead, she and Bruce went downstairs and watched television until they fell asleep. K. M. was on the sofa, and Bruce was on the floor. The next day, K. M. went next door and played with two girls. She testified, "And I spent the night with them because I didn't want to go back over

[to Bruce's house] because I didn't know if he was going to do it again." Sunday, K. M. went to church with the girls and their parents. Afterward, she waited at Bruce's home until her mother picked her up.

K. M.'s mother testified that the incident occurred about a week before Halloween 1997. K. M. was living with her mother, Manor, and her two brothers. Her mother had met Bruce through Manor and Lee and considered Lee and Bruce her friends. K. M.'s mother recalled that on that Saturday, she spoke with K. M. and Bruce by telephone several times. Bruce mentioned that K. M. had experienced a nightmare. K. M.'s mother testified that K. M. did not mention any nightmare or say anything to her that seemed out of the ordinary. On Sunday, K. M.'s mother picked up K. M. and dropped off Lee. K. M.'s mother testified that K. M. did not appear upset during the drive home, that K. M. expressed no anger or dislike toward Bruce, and that she did not say anything odd.

Manor, who had been sharing a home with K. M.'s mother and her children since 1992, recalled the weekend that K. M. spent with Bruce and testified that there was nothing unusual about K. M.'s behavior after she returned home.

K. M. did not immediately tell anyone about the incident. But about four weeks later, having pizza for dinner one evening with her mother and one of her brothers reminded her of her weekend with Bruce. She related to her mother, her brother, and later to Manor that Bruce had touched her genital area. Within a week, K. M.'s mother contacted a therapist who had counseled one of her sons. After talking with K. M., the therapist reported the matter to police on November 19, 1997. K. M. was not taken to a physician.

The detective assigned to the case talked to the therapist, and later in November, he interviewed K. M. for 27 minutes. The interview was videotaped and later played for the jury. K. M. told the detective during the interview that Bruce had touched her "tutu," that she had cried and asked to call her mother, and that Bruce had refused and instead led her downstairs to watch television.

The detective testified that after his numerous unsuccessful attempts to contact Bruce during the next two months, the case lay "basically unworked" from November 1997 to April 1998 due to his caseload. In May 1998, the detective resumed his investigation, conducting a six-minute interview with K. M.'s mother, a one-minute interview with K. M.'s brother, and a two-minute interview with Manor — each concerning only K. M.'s outcry. The detective also interviewed Lee. Later that month, the detective obtained a warrant for Bruce's arrest.

Bruce was the sole defense witness. He denied molesting K. M., giving a different account of what happened that Friday night.

According to Bruce, after K. M. went to bed, he fell asleep on the sofa downstairs watching television. Later, K. M. came downstairs crying because she had experienced a nightmare. Because she was too afraid to sleep alone upstairs, Bruce let her sleep on the sofa, and he slept on the floor.

Lead defense counsel argued in closing that the state had left "a lot of gaps in the evidence." She argued that K. M.'s allegations were unfounded, pointing out that K. M. had stated that she had been asleep when Bruce allegedly touched her and that K. M. had made no outcry for a month. Further, lead counsel argued that the detective's less than one hour investigation had been insufficient. She pointed out that the detective had failed to corroborate K. M.'s allegations with physical or medical evidence, failed to investigate the case during a pertinent time period, failed to delve into K. M.'s family's dynamics, and failed to interview the parents of the two girls next door to Bruce's home. Lead counsel asserted that the gaps in the state's evidence amounted to reasonable doubt that Bruce had molested K. M.

On appeal, Bruce claims that the trial court erred in denying his motion for new trial, contending that he received ineffective assistance of counsel. To prevail on this claim, Bruce must establish, pursuant to *Strickland v. Washington*,[1] that counsel's performance was deficient and that the deficient performance was prejudicial to his defense.[2] Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.[3] In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review a trial court's legal conclusions de novo.[4]

1. Bruce argues that his trial counsel's performance was deficient because counsel failed to fill the evidentiary gaps with testimony of certain witnesses to establish that K. M. was either mistaken or lying. At the motion for new trial hearing, lead defense counsel, who had worked either as a prosecutor or as a defense lawyer since 1989, explained that based upon her investigation of the case and trial preparation, she determined that the benefit of preserving final closing argument outweighed any benefit of calling additional witnesses. Deciding which defense witnesses to call is a matter of trial

---

[1] 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

[2] See *Conaway v. State*, 277 Ga. 422, 424 (2) (589 SE2d 108) (2003).

[3] *Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993).

[4] *Suggs v. State*, 272 Ga. 85, 87-88 (4) (526 SE2d 347) (2000).

strategy and tactics.[5] Further, declining to present evidence to preserve the final word in closing argument is a well-recognized trial tactic.[6] As a general rule, matters of strategy and tactics, "whether wise or unwise, [do] not amount to ineffective assistance of counsel."[7] Trial counsel is afforded tremendous deference over matters of trial strategy; however, the strategy that is selected must be supported by adequate investigation.[8]

Lead defense counsel outlined at the motion for new trial hearing her investigation of the case and the development of the defense strategy and tactics. She had reviewed the state's discovery responses and had attempted to interview K. M.'s family members, but K. M.'s mother would not agree to that. She had reviewed records of the Department of Family and Children Services (DFCS) concerning K. M.'s family and found "lots of case notes about [K. M.'s mother], her two sons, and there may have even been some notes with DFACS case workers about [K. M.]" Noting that DFCS's involvement with the family had ended two years before the incident, she determined that the records were not pertinent to Bruce's defense. She had interviewed the parents of the girls next door to Bruce, who told her that K. M. had exhibited no odd behavior during that weekend. She had tried to contact Lee, but her contact information proved inaccurate. Lead counsel did not recall Bruce providing her with names of any individuals who would give good character evidence. Based on her investigation and assessment of the state's case as weak, lead counsel mounted a defense to show that the state's case left reasonable doubt. As part of that strategy, she brought in another attorney, who had been practicing since 1991 and whose work experience included seven years prosecuting felony cases, for the specific task of cross-examining the detective.

Co-counsel explained that her goal was to impress upon the jury

> There [were] more questions than answers. There was no investigation. The police did nothing but talk to this kid and decide to take a warrant. And that was — in my mind at that time that was my spin on the case, and that was going to be my — the basis of my cross-examination for the police officer was you didn't investigate.

---

[5] See *Roberts v. State*, 263 Ga. 807, 808 (2) (b) (439 SE2d 911) (1994).

[6] See *Washington v. State*, 276 Ga. 655, 659 (3) (c) (581 SE2d 518) (2003).

[7] (Citation and punctuation omitted.) *Berry v. State*, 267 Ga. 476, 482 (4) (i) (480 SE2d 32) (1997).

[8] *Turpin v. Christenson*, 269 Ga. 226, 239 (12) (b) (497 SE2d 216) (1998).

(a) Bruce claims that trial counsel should have established that K. M. was mistaken by presenting expert testimony that what she had alleged occurred only in her nightmare. At the hearing on the motion for new trial, Bruce presented expert testimony from James Stark, Ph.D., a licensed psychologist, who stated that children under 12 years of age often blur dreams with reality and that, after experiencing a bad dream, they often awaken crying for their mothers.

The fact that children sometime have difficulty distinguishing nightmares from reality is not beyond the ken of the average juror. The jury could have determined, without the help of expert testimony, K. M.'s credibility and believability on the issue of whether the incident actually happened or was a nightmare. Thus, defense counsel's decision to decline calling an expert on this issue, preserving the final word in closing argument, was reasonable trial strategy.

(b) Bruce claims that defense counsel should have established that K. M. was either mistaken or lying about what happened by presenting expert testimony concerning her family. According to Stark, DFCS records dating from 1986 to 1992 contained reports that K. M.'s mother, father, and one of her brothers might have suffered sexual abuse. Stark testified that a family's history of sexual abuse might increase "sexual behavior and sexual talk in children" of that family and might explain why such children would make false allegations of molestation. Stark surmised from the DFCS records that K. M.'s family was "dysfunctional" or "pathological," and he testified that "in some cases of allegations of abuse which do not, in fact, pan out, those cases involve pathological families."

The state counters that an expert's opinion regarding whether K. M. was truthful in her accusations would not have been admissible. Georgia law forbids expert opinion testimony that directly bolsters the victim's credibility (i.e., that the victim is telling the truth) or that implicitly goes to the ultimate issue to be decided by the jury, when such issue (i.e., that the victim was sexually abused) is not beyond the ken of the average juror.[9] But there is nothing wrong with bolstering the credibility of the indicted allegations of sexual abuse

---

[9] *Odom v. State*, 243 Ga. App. 227-228 (1) (531 SE2d 207) (2000); see *Mills v. State*, 251 Ga. App. 39, 42-43 (3) (553 SE2d 353) (2001) (trial court did not err in excluding testimony by expert in forensic psychology that the victim would be prone to using sex as a tool to exercise power over adults to the point of making false allegations of child molestation); *Gorski v. State*, 201 Ga. App. 122, 123 (2) (410 SE2d 338) (1991); *Jennette v. State*, 197 Ga. App. 580, 582-583 (3) (398 SE2d 734) (1990) (trial court did not err in excluding expert testimony concerning "lying child syndrome" proffered by defendant to explain a child's propensity to relate and repeat untruthful statements about a person who is an authority figure to manipulate that child's environment, because such testimony went to victim's credibility and believability – issues that did not necessitate expert testimony).

with expert opinion testimony (e.g., that the victim's physical examination showed injury consistent with sexual abuse or that the victim's psychological evaluation was consistent with sexual abuse).[10]

Lead counsel noted that DFCS's involvement with K. M.'s family had ended two years before the incident. Based on her determination that the records were not pertinent to Bruce's defense, she concluded that the benefit of preserving final closing argument outweighed any benefit of calling additional witnesses. At the motion for new trial hearing, Bruce presented expert testimony concerning the DFCS records, but the records on which the expert focused dated only through K. M.'s toddler years. And although Bruce presented evidence at the motion hearing that K. M.'s mother "readily talked" about having been molested, there was no showing that she had done so in K. M.'s presence. Furthermore, Bruce's expert did not testify that the DFCS records were consistent with child molestation in this case. Bruce has failed to show that lead counsel's decision not to call additional witnesses concerning K. M.'s family was not reasonable trial strategy.

(c) Bruce claims that defense counsel should have called Lee and the parents of the two girls who lived next door to Bruce to testify that K. M. exhibited no behavior indicating that she had been traumatized. That evidence would have been cumulative of other undisputed testimony by K. M.'s mother and her fiancé that K. M. exhibited no odd behavior after the incident. Furthermore, lead defense counsel interviewed Bruce's neighbors and determined that preserving final closing argument outweighed their input. Bruce has shown no deficient performance for not presenting these individuals as witnesses.[11]

(d) Bruce claims that defense counsel should have called Lee's parents as character witnesses. Lee's parents would have testified that they knew Bruce to have a good reputation in the community and that they would believe him under oath. But according to lead defense counsel, Bruce named no one who would serve as a character witness.

We conclude that counsel's investigation was adequate and counsel's decision not to call other witnesses was reasonable trial strategy.

2. Bruce claims that trial counsel was ineffective for neither objecting nor moving for a mistrial when the state elicited the

---

[10] *Odom*, supra.
[11] See *Washington*, supra.

detective's testimony concerning the detective's numerous unsuccessful attempts to talk with him about K. M.'s allegation. Bruce claims that the testimony constituted an improper comment on his right to remain silent.

In *Mallory v. State*,[12] our Supreme Court stated:

> OCGA § 24-3-36 provides that "[a]cquiescence or silence, when the circumstances require an answer, a denial, or other conduct, may amount to an admission." We take this opportunity to hold that in criminal cases, a comment upon a defendant's silence or failure to come forward is far more prejudicial than probative.

The detective testified in response to the state's questioning that, within a two-month span, he had gone to Bruce's house about ten or fifteen times and telephoned Bruce and left messages on an answering machine many times. When the detective resumed his investigation of this case in April, he spoke to Bruce several times by telephone and an interview had been scheduled. But Bruce did not appear.

This testimony was an improper comment on Bruce's silence or failure to come forward, but such an impropriety does not automatically require reversal.[13] The determination of harmful error must be made on a case by case basis, taking into consideration the facts, the trial context of the error, and the prejudice created thereby as juxtaposed with the strength of the evidence of the defendant's guilt.[14]

In this case, Bruce must show that "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[15] Bruce has failed to make that showing. The thrust of Bruce's defense was that the case had been insufficiently investigated. The record shows that lead counsel characterized the detective's unsuccessful attempts to reach Bruce as further evidence of the detective's inadequate and ineffective investigation. And during closing argument, lead counsel stated, "[T]his case wasn't important enough that [the detective] actually track down and s[i]t Ken Bruce down for an interview." Furthermore, co-counsel addressed the cited testimony during cross-examination

---

[12] 261 Ga. 625, 630 (5) (409 SE2d 839) (1991), overruled on other grounds, *Clark v. State*, 271 Ga. 6, 10 (5) (515 SE2d 155) (1999).

[13] See *Taylor v. State*, 254 Ga. App. 150, 152 (3) (561 SE2d 833) (2002).

[14] Id.

[15] (Citation and punctuation omitted.) *Head v. Carr*, 273 Ga. 613, 616 (4) (544 SE2d 409) (2001); see also *Strickland*, supra, 466 U. S. at 694.

of the detective, asking him, "[Bruce is] not required by law to speak with you, is he?" The detective responded, "I didn't say he was." Under these circumstances, we are unable to conclude that there is a reasonable probability that, but for counsel's failure to object or move for a mistrial after the state's brief questioning about Bruce's failure to come forward, the outcome of the trial would have been different.[16]

3. Bruce contends that defense counsel performed deficiently by failing to request a jury charge on false swearing as set forth in OCGA § 24-9-85 (b). That Code section provides, "If a witness shall willfully and knowingly swear falsely, his testimony shall be disregarded entirely, unless corroborated by circumstances or other unimpeached evidence." "[T]he testimony which must be disregarded in its entirety is only that which is wilfully and knowingly false."[17]

Although Bruce presented evidence contradicting parts of K. M.'s testimony, there was no showing that the child's testimony was wilfully and knowingly false. Accordingly, trial counsel was not deficient for failing to request a charge on the principles contained in OCGA § 24-9-85 (b).[18] Moreover, the record reveals that the court adequately charged the jury on witness credibility.

4. Bruce contends that his trial counsel was ineffective for failing to request a charge that "the uncorroborated testimony of the defendant is sufficient for you to find the defendant not guilty of the charge contained within this indictment if that testimony convinces you that the state has not proven the defendant's guilt beyond a reasonable doubt." While the substance of the charge may be sound, it was covered in the pattern charges given on reasonable doubt, witness credibility, and the state's burden of proof.[19] Thus, trial counsel was not deficient in failing to request that the jury be charged with that exact language.[20]

*Judgment affirmed. Smith, C. J., and Johnson, P. J., concur.*

DECIDED JULY 9, 2004 —
RECONSIDERATION DENIED JULY 23, 2004 — ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

*Lenzer & Lenzer, Robert W. Lenzer, Thomas P. Lenzer,* for appellant.

---

[16] See *Taylor,* supra at 152-153.

[17] *Turner v. State,* 245 Ga. App. 294, 297 (4) (d) (536 SE2d 814) (2000); see also *Steele v. State,* 248 Ga. App. 441, 442 (1) (546 SE2d 547) (2001).

[18] See *Turner,* supra.

[19] See *Callahan v. State,* 256 Ga. App. 482, 487 (3) (c) (568 SE2d 780) (2002); compare *Benham v. State,* 277 Ga. 516 (591 SE2d 824) (2004).

[20] See *Callahan,* supra.

*Daniel J. Porter, District Attorney, James M. Miskell, Assistant District Attorney*, for appellee.